**Lashaunda K. POINDEXTER, Plaintiff,**

v.

**Kenneth S. APFEL, Commissioner of Social Security Defendant.**

**No. CIV.A.99–2190–KHV.**

United States District Court, D. Kansas.

Feb. 29, 2000.

Robert D. Linscott, Kansas City, MO, for Lashaunda Poindexter.

Melanie D. Caro, Office of the U.S. Atty., Kansas City, MO, for Commissioner of Social Sec.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

This matter is before the Court on plaintiff's *Motion for Judgment* (Doc. # 5) filed October 26, 1999. Plaintiff brings suit under 42 U.S.C. § 1383(c)(3) seeking judicial review of the Commissioner's decision to deny benefits under the Social Security Act ("SSA"). For reasons set forth below, plaintiff's motion is sustained.

### Procedural Background

On October 27, 1993, plaintiff applied for supplemental security income ("SSI") disability benefits under Title XVI.[1] The Social Security Administration denied her request throughout the administrative process. *See* Tr. 44–45, 73–74. Plaintiff sought review in the district court. In a report and recommendation dated January 15, 1998, the magistrate found that the Commissioner's determination that plaintiff could perform light work was not supported by substantial evidence. Tr. 323–57. The magistrate recommended remand to determine whether plaintiff could perform sedentary work. R. 357. On February 13, 1998, the district court adopted the magistrate's report and recommendation and remanded the case to the Commis-

---

1. Plaintiff also filed an application for disability insurance benefits on November 3, 1993. On February 13, 1996, however, her attorney informed the Administrative Law Judge that she would not pursue her application for disability insurance benefits. *See* Tr. 262.

sioner. Tr. 358. The administrative law judge ("ALJ") who had initially denied plaintiff's claim then disqualified himself and the SSA assigned the case to another ALJ. Tr. 364. Plaintiff amended her alleged onset date and requested a closed period of disability from October 27, 1993, to December 6, 1995. On October 19, 1998, after a second hearing, the new ALJ found that plaintiff was not disabled because she could perform sedentary past work. Tr. 300–11. The ALJ decision stands as the final decision of the Commissioner.

### Factual Background

On August 8, 1992, the University of Kansas Medical Center ("KUMC") admitted plaintiff after a car accident. KUMC diagnosed an extensive musculoskeletal strain injury. Tr. 160–61. Plaintiff reported pain in her neck, chest, back, right elbow and humerus, and left knee. Tr. 160, 164. On October 19, 1992, plaintiff sought treatment at the Injury Rehab Center, where Dr. James F. Holleman, Jr., D.O., diagnosed headaches, tendonitis of the left knee, multiple contusions, sprains and strains. Tr. 120. At the time, plaintiff was ten weeks pregnant. Dr. Holleman recommended physical therapy and exercise, limited because of her pregnancy. Dr. Holleman limited plaintiff to light duty at work with no lifting. Tr. 132. A physical capacity test identified a work classification ranging from sedentary to medium and a risk classification ranging from high to very high. Tr. 123.

From October 19 through December 28, 1992, plaintiff received physical therapy four times a week or more frequently. She continued, however, to have pain in her head, neck, chest and left knee. Tr. 119, 134, 136–39, 140, 142. Dr. Holleman recommended that she avoid strenuous or repetitive activities that caused or aggravated the pain, and remarked that the pregnancy severely limited treatment. On January 5, he noted that plaintiff continued to experience pain and recommended that she not work "indefinitely, probably be after delivery (4☜ months)" and that she then get the needed therapy. Tr. 145. He concluded that improvement should be possible.

On March 10, 1993, the Wyandotte County Health Department, Family Planning/Prenatal Division, placed plaintiff on bed rest for her pregnancy. On May 12, 1993, plaintiff delivered her daughter at Bethany Medical Center.

On June 21, 1993, plaintiff saw Dr. Holleman, who prescribed two to four weeks of physical therapy. Tr. 147–150. On July 7, Dr. Holleman assessed headaches on most days, trauma to knees, chronic sprain of the cervical ligament, myofascitis of the right neck and shoulder, chronic strain of lumbar muscles and sprain of ligaments. He recommended an orthopaedic surgical consult for her knees, physical therapy, stretching exercises and medication. He noted that plaintiff had no funds to obtain medication, and opined that if physical therapy was not effective, she might need injection therapy. Tr. 152.

On July 28, 1993, plaintiff returned to Dr. Holleman, complaining of pain. She had attended only three physical therapy treatments since July 7, because she had no car and no money. She told him that she had to get a job and work, even with the pain. He recommended that she continue exercises and not return to work until she visited KUMC on August 4, 1993.

Stephen Munns, M.D. examined plaintiff at KUMC on August 4, 1993 and found that she had weakness and pain in her knees, mild tibial femoral crepitus, and patella femoral crepitus, severe on the right and moderate on the left. X-rays indicated "severe lateral subluxation of both patella with a component of tilt greater on her right." Tr. 186. In contrast, Glendon Cox, M.D. also examined the X-

rays and identified only slight lateral subluxation of both patellas. Tr. 187. Dr. Munns prescribed ice four times a day, medication as needed, a patella support brace, a rehabilitation program to strengthen thigh muscles, weight loss, and re-evaluation in six weeks. Tr. 186.

On September 28, 1993, Dr. Holleman again examined plaintiff. He found a slight improvement in her right knee, but no improvement in her back or neck. He noted that she should not work until she received effective treatment for her ligaments. He referred her to Dr. Reeves for evaluation and treatment. Tr. 156.

On October 20, 1993, Dr. Reeves examined plaintiff and assessed ligament strain. Tr. 210. He stated that she appeared to be using her fingers in more fine motor activities recently, possibly creating forearm pain from the radial collateral ligament. He also noted that the knee pain appeared to be directly related to the blow on the patella. He found that plaintiff had twitch contractions—evidence of myofascial trigger activity—and specific ligament tenderness, "which would account for her pain complaints in their present areas." Tr. 211. Dr. Reeves stated that

> Unless these ligaments and capsules can be strengthened, symptoms cannot be substantially altered. We need to get this patient back to work, and it appears as though, despite patient's size which is somewhat related to inactivity and somewhat recent pregnancy, she should be treatable. An 80% chance of substantial improvement of pain is present despite the long period of time since the accident.

Tr. 212. Dr. Reeves noted that plaintiff exhibited a clear desire to return to some type of work, if possible. Tr. 210.

Dr. Reeves gave plaintiff a trigger injection of ligaments and tendons on November 15, 1993. He was concerned that it might not be effective, because of her large size.

On November 16, 1998, Dr. Reeves reported that:

> This 22–year old patient had an August 8, 1992 motor vehicle accident and saw me, having experienced a chronic pain for more than a year. She had a number of objective findings on examination. These mostly consisted of twitch contractions on examination in areas that would be characteristic for causing pain and in the areas she complains of. I specifically noted on musculoskeletal examination and neurological examination the following. . . . Joint examination indicates subpatellar pain with motion, and this pain was bilateral, and pain was quite marked over the upper back and neck and midback and lower back and gluteal regions. She also had discomfort over the radial collateral ligaments about the wrist and over the TMJ area. Her strengths were inhibited by pain from full testing, and it appeared to be at least 4/5. . . . The assessment was, after exam, that this 22–year–old patient did not have a previous pain history, and had an auto accident that lead to objective changes in the forms of myofascial pain triggers which can easily be elicitable on exam. These appear to be widely distributed through the body in an area in which they will affect both postural movement and repetitive movement. To be more specific, the involvement of facet ligaments and intertransverse ligaments in the neck and upper trapezius will make sitting tolerance limited to approximately 20 minutes, and repetitive movements of the arms will also be limited, and overhead movements should best be avoided at this time. Because of an involvement of paraspinals in the remainder of her back, mid to lower back, she will also have trouble with sitting tolerance for this reason, but also bending, twisting, and reaching will increase pain to such a degree that it will not be tolerated. Discomfort over the radial

collateral ligaments does imply that repetitive wrist motions will cause increasing pain, and involvement of facet levels up and down the back implies that heavy activity or lifting will not be tolerated as well. From a functional standpoint, we see reflected at home the difficulties she has holding her 5–month–old child and asked her parents to hold the child much of the time since she is now living in her mother's home. The overall summary of present status is that this patient has limitation of repetitive movement, heavy movement, or holding positions in one place and, for that reason, would be impaired for a variety of work.

Tr. 189. Dr. Reeves diagnosed "Widespread myofascial pain syndrome, post-traumatic." Tr. 190.

On January 20, 1994, at the request of the Commissioner, N. Berner, M.D. examined plaintiff. Dr. Berner also diagnosed plaintiff with post-traumatic myofascial pain syndrome. Tr. at 44, 73. He found, however, that plaintiff could frequently lift, carry or pull ten pounds, and that she could stand, sit and walk for about six hours of an eight-hour day. He found no exertional limitation on her ability to push. Dr. Berner found that plaintiff could occasionally kneel, crouch or crawl. Tr. 49. He stated that the severity or duration of the symptom(s) was disproportionate to the expected severity or duration, based on plaintiff's medically determinable impairments. Tr. 2. He opined that plaintiff was not disabled and stated that light work appeared reasonable in the near future. Dr. Berner also stated that minimal positive and objective findings supported Dr. Reeve's opinion that light work would be precluded until mid–1994. Tr. 53.

On February 4, 1994, plaintiff again saw Dr. Reeves. He found that her condition had not improved, and he noted obvious twitch contractions for myofascial pain. Plaintiff reported difficulty washing her hair and caring for her child. She also had a prominent sleep disturbance. Dr. Reeves decided to discontinue injections until he could improve accuracy of the injections; he wanted to wait a few months to determine if techniques had advanced enough to enable him to make a substantial impact on her pain. Dr. Reeves continued to find that plaintiff's ability to do light work was severely restricted. Tr. 215.

On May 15, 1994, plaintiff was involved in a second motor vehicle accident. She received treatment at Bethany Medical Center where she reported back and side pain but no neck pain. Tr. 194. X-rays of her cervical spine, right hand, pelvis and right hip revealed nothing significant, and the doctors at Bethany diagnosed a multiple contusion injury.

On July 25, 1994, at the Commissioner's request, plaintiff had a further examination at KUMC. Doctors James S. Zarr, Bruce Reifenrath and Robert D. Rondinelli reported an impression of "[d]iffuse myofascial pain (fibromyalgia)." Tr. 208. A physical examination revealed normal muscle strength, an atalgic gait, a functionally normal range of motion in both upper and lower extremities, mild lateral patellar laxity bilaterally, and positive patellar apprehension on the right. Plaintiff had "trigger point tenderness" in her forearms, lower paraspinals and greater trochanter regions. She had low-back pain without radicular symptoms on straight-leg raising. Tr. 207–08. She complained of alteration to soft touch and pin prick on the right median forearm, which the examining physicians found inconsistent with testing. Tr. 208. The three doctors gave no opinion on disability. Tr. 207–08. They noted that in February 1994, Dr. Rondinelli had referred her for psychological evaluation (to assess barriers to rehabilitation) and a functional capacity evaluation for return to work restrictions, but that she failed to follow through on these recommendations. Tr. 207.

On August 15, 1994, plaintiff saw Dr. Reeves, complaining that her condition was worse after the car accident in May. She could walk for only ten minutes at a time and could not tolerate lifting even ten pounds. Dr. Reeves found twitch contractions present, and performed injection therapy on several areas. He stated that the amount of triggers were incompatible with gainful employment "unless her activity is diminished." Tr. 217. He noted that in order for plaintiff to be able to perform light work, "we have to hope to reverse the process by strengthening individual tendons and diminishing trigger activity." *Id.*

On August 17, 1994, Dr. M. Hausheer, diagnosed plaintiff with post-traumatic stress disorder, with a secondary diagnosis of myofascial pain syndrome. Tr. 46, 74. He found that plaintiff could frequently lift, carry, or pull ten pounds, and occasionally 20 pounds. He found that plaintiff could sit, stand and walk for about six hours of an eight-hour day. She could occasionally climb, stoop, kneel or crouch. Tr. 57. He found no environmental limitation. Tr. 59. He attributed the symptoms to a medically determinable impairment. Tr. 60.

On September 14, 1994, Dr. Reeves examined plaintiff and found while her condition had improved, she still had pain in all areas. He gave her injections and stated that no work was feasible at that time, "but hopefully we will be able to comment on that in the relatively near future." Tr. 218. On October 25, 1994, Bethany Medical Center admitted plaintiff with complaints of chronic pelvic pain and dyspareunia. The Bethany medical records noted a one-year history of pelvic inflammatory disease, and a dilation and curettage in March, 1994 for an incomplete abortion. Tr. 198. A diagnostic laparoscopy did not reveal any significant findings. Tr. 198–99.

In December 1994, plaintiff visited the Douglas County Community Health Center (DCCHC), complaining of headaches and other infirmities. A physical examination revealed mild muscle spasms in her neck and tenderness along her lower spine. The DCCHC records note Dr. Reeve's treatment with trigger point injections. *See* Tr. 228. Plaintiff visited DCCHC several times in the first half of 1995. Many of those visits dealt chiefly with gynecological symptoms not relevant to this case. On April 26, 1995, DCCHC gave plaintiff an injection in her left arm to address complaints of wrist pain. Tr. 239. DCCHC records reveal that she complained of headaches and "arthritis" on most visits.

On February 16, 1995, Dr. Reeves administered further injection therapy to plaintiff, who reported that she had been doing "pretty well" (since her treatment in September) until a minor car accident in January caused her condition to worsen. Tr. 220. On June 23, 1995, Dr. Reeves noted that plaintiff's pain was centralized to the sacroiliac region and opined that if this area could be strengthened, her symptoms might markedly diminish. Tr. 221.

On July 29, 1995, Dr. Reeves summarized plaintiff's diagnoses as follows:

1. Post traumatic fibromyalgia with whole body pain;

2. Sprain and strain, insufficiently healed, with myofascial pain syndrome with trigger activity.

*Tr.* at 222. He noted that although the pain in plaintiff's head, neck and jaw were reduced, she still had significant back pain. He doubted that she would improve if she did not get some favorable back response to the stronger injection. Dr. Reeves stated that plaintiff had symptoms of "sympathetic nerve system irritation from strain in the neck, termed Barre–Lieou Syndrome, with hand stiffness, swallowing difficulty, nauseating headache tendency, blurriness of vision, and ringing in ear tendency." Tr. 223. He stated

that plaintiff's legs had a tendency to "give out" while walking, because of laxity of "sensory organs and tendon and ligament attachments and inhibition of muscles from the connective tissue changes." *Id.* Dr. Reeves then set forth the following functional limitations for plaintiff: she could (1) lift 30 pounds rarely, 20 pounds occasionally, and ten pounds frequently; (2) push and pull, bend back, reach above her shoulders and reach forward every 20 minutes; (3) occasionally climb stairs, although he did not advise it; (4) occasionally perform firm and gentle grasp and finger pickup; (5) write for ten minutes; (6) sit or stand in one place for 20 minutes; and (7) walk for 20 minutes. She could not push down with either foot. Dr. Reeves noted that plaintiff "finds it necessary to recline during the day to reduce pain levels" about every two hours. Tr. 224. Dr. Reeves stated that plaintiff could not dust, garden or mow. She had limited ability to pace herself in performing some basic household chores and activities, including cooking, vacuuming, and grooming. He doubted that plaintiff would be able to work in the reasonable future. Tr. 224.

On December 6, 1995, plaintiff again saw Dr. Reeves and reported reduced pain, with still significant pain in her lower back. Dr. Reeves gave her injections in her lower body and recommended a follow-up in three months. He suggested that with increased medication plaintiff should slowly gain improved function, but opined that she would not be able to return to work in the reasonable future. Tr. 257. On April 23, 1996, Dr. Reeves wrote that plaintiff was unable to do light work Tr. 263–64.

Plaintiff was 27 years old when she testified at the second administrative hearing. Before she applied for benefits in 1993, she had attended college and worked as a day care aide. After being injured in the car accident in August 1992, she had difficulty walking, standing and using her hands.

She experienced severe pain and swelling and could not stand for long periods of time. She had trigger point therapy injections which lessened her pain. At this time she had a newborn infant and her mother helped care for the child because plaintiff could not pick her up or hold her for long. *See* Tr. 384–390.

Plaintiff testified that she took medications to control her pain, including Amitriptyline, Flexeril, Ultram, Trazadone and Darvocet. Some of these drugs made plaintiff feel drowsy and confused, and her mother felt that she could not care for her child when she took Trazadone or Amitriptyline. *See* Tr. 390–91.

Plaintiff testified that she had good days and bad days, but that the vast majority were bad days. On bad days, she could not wash herself or put on her pants or shoes. Standing and walking were difficult. Plaintiff could stand for perhaps 15 minutes at one time. *See* Tr. 390–91. Plaintiff became stiff if she sat for very long. She spent most of her day lying down with pillows between her legs and behind her back. Tr. 393. Plaintiff could lift ten to 15 pounds while sitting. During much of this time she did not perform any household chores, although she did bathe her baby. In late 1994, she began doing household chores including dusting or washing dishes. Plaintiff stopped attending school because she could not walk to class and could not afford to pay for a ride. Tr. 395–402. She received AFDC and Social Security benefits for her daughter. She received insurance to pay for her treatment after the car accident, and ultimately received a settlement from which she paid medical bills and debts to her mother; leaving her with a few thousand dollars. Tr. 405–08.

Plaintiff testified that although her physician did not release her to work, she felt that she had to work because of her financial situation. Thus, in 1997, she worked

as a bank teller, a job which allowed her to alternate standing and sitting. She also worked at a fast food restaurant. At the time of the second hearing she was not working due to asthma and pain in her hip and leg. Tr. 410.

Dr. Lynn DeMarco, M.D., a board certified internal medicine and rheumatology specialist, testified as a medical expert at both hearings. At the second hearing, Dr. DeMarco testified that his review of the medical evidence indicated that plaintiff's diagnosis was fibromyalgia, with indications of soft tissue disorder. In his opinion plaintiff's condition did not meet the severity for any listed impairments. Dr. DeMarco also stated that in his opinion the medical evidence did not establish a "medically determinable need for claimant to lie down" periodically, and he did not agree with Dr. Reeve's statements that she needed to lie down. He based his opinion on the lack of evidence of significant joint inflammation, range of motion restrictions or other evidence of musculoskeletal pathology.

Dr. DeMarco testified that in his opinion plaintiff was not restricted in sitting, standing, walking, lifting, bending, climbing stairs or grasping and gripping. He would have recommended exercise, a standard treatment for fibromyalgia, and stated that although plaintiff might experience pain in such a program, it would not risk tissue damage.

Jerold Hildre testified as a vocational expert ("VE") at the second hearing. He testified that plaintiff's former job as a telephone solicitor was sedentary and unskilled. The ALJ asked the VE to consider a person with the following abilities and limitations: 22 to 25 years old, high school education, non-severe depression with slight limitations on activities of daily living and social functioning, able to sit for six hours per day with a break every two hours, able to lift no more than ten

pounds, no limitation on gripping or grasping small objects for brief periods of time, able to stand for 30 minutes at a time for a total of two hours per day, not able to bend or climb stairs vocationally, able to walk a block or so but not on uneven surfaces. Tr. 441–442. The VE testified that such a person could perform plaintiff's past work as a telephone solicitor. If the person also had to lie down for 50 to 75 percent of work days due to pain, she could not work. Tr. 442.

In his order of October 19, 1998, the ALJ made the following findings:

1. The claimant did not engage in substantial gainful activity during her requested closed period of disability.

2. The medical evidence establishes that claimant has fibromyalgia and non-severe depression, but she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

3. Claimant's subjective allegations of pain and other symptoms are found not credible for the reasons set forth in the Evaluation section of this decision.

4. Claimant, during her requested closed period of disability, had a residual functional capacity for physically non-stressful sedentary work as long as she did not lift more than ten pounds. She could sit six hours of an eight hour workday, but she must have been able to take a break after two hours of sitting. She could perform gripping and grasping, but only for short periods. She could stand two of eight hours and she could walk one block, but she could be on her feet for only thirty minutes maximum at a time. She could not walk on uneven terrain.

5. Claimant's past relevant work as a telemarketer did not require the performance of work-related activities precluded by the above limitations.

6. Claimant's impairments did not prevent her from performing her past relevant work.

7. Claimant was not under a "disability" as defined in the Social Security Act, as amended, at any time during her requested closed period of disability.

Tr. 310.

### Standard of Review

The ALJ's decision is binding on the Court if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Dixon v. Heckler*, 811 F.2d 506, 508 (10th Cir.1987). The Court must determine whether the record contains substantial evidence to support the decision and whether the ALJ applied the proper legal standards. *Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir.1994). While "more than a mere scintilla," substantial evidence is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Evidence is not substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion." *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)).

### Analysis

Plaintiff bears the burden of proving disability under the SSA. *See Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 360 (10th Cir.1993); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least twelve months due to a medically determinable impairment. *See* 42 U.S.C.A. § 423(d)(1)(A). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. 20 C.F.R. §§ 404.1520, 416.920 (1996). Here, the ALJ denied benefits at step four, essentially rejecting plaintiff's assertion that her impairment prevented her continuing her past relevant work as a telemarketer.

Plaintiff argues that the ALJ erred in discrediting plaintiff's subjective complaints of pain.[2] In evaluating a claim of disabling pain, the ALJ must consider (1) whether the medical evidence estab-

---

**2.** Plaintiff points out that the district court remanded this case for a determination whether she could perform sedentary work. Plaintiff argues that on this appeal the Court must follow the findings of the district court, on the first appeal, that "the Commissioner should have given controlling weight to the opinions of Dr. Reeves," Tr. 347, and that the ALJ's determination that plaintiff's complaints of pain were not credible was not supported by substantial evidence. But this Court does not read the remand order as requiring this Court to credit plaintiff's subjective complaints and the treating physician's opinion over that of the rest of the updated record.

The Court has diligently searched for controlling cases in which the district court has remanded for a limited purpose (*e.g.*, to determine whether plaintiff could perform prior work or to determine whether at step five plaintiff could perform any work in the national economy, etc.), but the ALJ has proceeded to perform a completely new analysis. This scenario raises a troublesome question concerning the extent to which the district court on a second appeal might be obligated to apply the district court findings from the first appeal. The Court acknowledges cases in other Circuits holding that if the district court remands an action to the Secretary for further proceedings, the Secretary is estopped from re-deciding an issue that the court had

lishes a pain producing impairment; (2) if so, whether there is at least a loose nexus between the impairment and the claimant's subjective complaints of pain; and (3) if so, whether considering all of the evidence, both objective and subjective, the claimant's pain is disabling. *See Luna v. Bowen,* 834 F.2d 161, 163 (10th Cir.1987). Once it is determined that claimant has an impairment capable of producing pain, as here, the ALJ must then consider her subjective complaints of pain and decide whether they are credible. The ALJ should consider factors such as "the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence." *Thompson v. Sullivan,* 987 F.2d 1482, 1489 (10th Cir.1993) (further quotation omitted).

■ The ALJ found that inconsistencies in the record discredit plaintiff's subjective claims of pain. He noted that an examining physician in 1994 found that her subjective complaints of alteration to soft touch and pin prick on her right median forearm were inconsistent with testing. The ALJ also referred to a disability report of November, 1992, in which plaintiff stated that the only jobs she could get required long periods of standing and a lot of movement, and that standing made the pain in her back and knee very bad. The ALJ noted that in this statement plaintiff attributed her disability to an inability to stand for long periods or to move, while her treating physician relied on her inability to sit for prolonged periods. The ALJ also noted that in her initial report plaintiff did not allege a need to lie down.

The ALJ pointed out that plaintiff has not required hospital treatment.[3] He also noted that during 1994, plaintiff improved so that she could care for her young child and do household chores, which the ALJ found consistent with "sedentary exertion." Tr. 307.

As for medications, the ALJ found no record evidence that plaintiff suffered any adverse side effects from medication during the period at issue. Claimant testified that the medications made her feel drugged, however, and that her mother would not allow her to care for her child while she was taking certain medications. Apparently the ALJ found that plaintiff's testimony on this point was not credible when compared to the medical notes of record.

The ALJ also noted that plaintiff had a sporadic work history with fluctuating levels of earnings and breaks in employment. The ALJ cited the fact that plaintiff received public assistance and supplemental security income for her daughter, as well as the settlement for the car accident, which provided her "very little financial incentive to return to work." Tr. 308.

The ALJ touched on the relevant *Luna* factors. Further, although this Court might have given more weight to the fact that plaintiff frequently sought medical care for her complaints of pain throughout the alleged period of disability, particularly from Dr. Reeves, many of the *Luna* factors require the ALJ to make credibility

---

already decided and which had become a final judgment. *See, e.g., Hooper v. Heckler,* 752 F.2d 83, 87–88 (4th Cir.1985); *Hodgson v. Celebrezze,* 357 F.2d 750, 751–752 (3rd Cir. 1966). In the end, however, the Court need not address this question because the answer

would not determine the ultimate outcome in this case.

3. The fact that claimant has not required extensive hospitalization may be somewhat relevant, but certainly it does not in itself preclude a finding of disability.

determinations. The Court finds that the ALJ relied on substantial evidence when he determined that plaintiff's complaints of disabling pain are not credible.

Plaintiff next argues that the ALJ improperly discounted the opinion of Dr. Reeves, a treating physician, in favor of the opinion of a medical expert, Dr. DeMarco, who testified at the hearing. The ALJ must give substantial weight to the opinion of a treating physician "unless good cause is shown to disregard it." *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 289–90 (10th Cir.1995). When a treating physician's opinion is inconsistent with other medical evidence, the ALJ's task is to examine the other physician's reports to see if they outweigh the reports of the treating physician. The ALJ must give specific, legitimate reasons for disregarding the treating physician's opinion that a claimant is disabled. *Id.* at 290. In addition, the ALJ must consider the following specific factors to determine what weight to give any medical opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d)(2)-(6).

In this case, the ALJ gave the following specific reasons for discounting Dr. Reeve's opinion that plaintiff was disabled and his assessment that she had severe pain and severe functional restrictions, including the need to lie down periodically during the day because of her pain: First, Dr. DeMarco testified that the record contained no evidence of significant joint inflammation, range-of-motion restrictions, or musculoskeletal pathology that would justify a need to lie down. Further, an examining physician determined that plaintiff could engage in light duty work with no lifting and no repetitive or strenuous activities that cause pain, without providing a need to lie down. The ALJ also noted that even on the date on which plaintiff's claim for disability ends, Dr. Reeves stated that she could not work within the reasonable future. This fact in itself sheds doubt on the opinion of Dr. Reeves. The ALJ found that the evidence raised "serious questions about just how familiar Dr. Reeves was with claimant's situation and just how forthright she was with him when she described her level of functioning." Tr. 308. The ALJ concluded that Dr. Reeves based his on opinions about plaintiff's pain and functional restrictions on plaintiff's subjective complaints of pain, which the ALJ found were not credible under the *Luna* analysis.

In evaluating plaintiff's physical impairments, the ALJ gave specific legitimate reasons for rejecting the opinion of her treating physician. Again, although this Court might not have reached the same conclusion as the ALJ, the Court cannot re-weigh the evidence. *See Casias v. Secretary of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir.1991). Substantial evidence supports the ALJ's decision not to give the opinion of the treating physician controlling weight.[4]

Plaintiff next asserts that the ALJ erred in applying step four of the sequen-

---

4. Plaintiff asserts that because the district court in the previous appeal found that the ALJ improperly gave weight to other record evidence over the opinion of Dr. Reeves, that the ALJ, and apparently this Court on review, must give Dr. Reeve's opinion controlling weight. The Court disagrees; on remand the ALJ developed the record more fully and was required to reconsider all of the evidence on the record.

tial analysis, at which the ALJ found that claimant was not disabled. Step four includes three phases. "In the first phase, the ALJ must evaluate a claimant's physical and [RFC] . . . and in the second phase, he must determine the physical and mental demands of the claimant's past relevant work." *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.1996). "In the final phase, the ALJ determines whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one." *Id.* The burden of proving disability remains with the claimant at step four; however, the ALJ has a duty "of inquiry and factual development." *Henrie v. United States Dep't of Health & Human Servs.*, 13 F.3d 359, 361 (10th Cir.1993).

Plaintiff asserts that in phase one of the step four analysis, the ALJ erroneously determined that plaintiff has the Residual Functional Capacity ("RFC") to perform sedentary work. The ALJ determined that plaintiff could sit for six hours per day with a break every two hours, stand for 30 minutes at a time for a total of two hours per day, walk one block, and grip or grasp for short periods of time. Tr. 309. Plaintiff asserts that the record does not contain evidence that she could sit for two hours at a time without a break. Plaintiff points to Dr. Reeve's opinion that she could not sit or stand for more than 20 minutes at a time, Tr. 224, as well as Dr. Holleman's opinion that she should avoid long periods of sitting or standing. Tr. 155.

As previously noted, the ALJ properly determined that Dr. Reeve's opinion as a treating physician is not controlling. Further, an examining physician, Dr. Berner, found that plaintiff could frequently lift, carry or pull ten pounds, and that she could stand, sit and walk for about six hours of an eight-hour day. Combined with the testimony of other examining and treating physicians, together with the tes-

timony of Dr. DeMarco, the record supports the ALJ's finding on plaintiff's RFC.

■ Plaintiff next contends that at the second phase of step four, the ALJ failed to make specific findings regarding the demands of her past work and improperly relied on vocational expert testimony to conclude that her limitations would allow her to perform past relevant work as a telemarketer. *See Winfrey*, 92 F.3d at 1023–26 (requiring fact findings regarding past work and discouraging practice of delegating fact-finding responsibility to vocational expert). The Court agrees that the ALJ failed to develop the record with factual information regarding the actual work demands of plaintiff's past relevant work and whether, given her physical and mental limitations, she could meet those demands. The only record evidence is the vocational expert's statement that plaintiff's work as a telemarketer was sedentary and unskilled. The ALJ did not inquire into the physical requirements of her work as a telemarketer, such as whether it required prolonged sitting or standing or frequent use of her hands.

The ALJ also failed to make any factual findings as to how plaintiff's impairments would relate to the actual demands of her work as a telemarketer. At the hearing, the ALJ asked the VE if plaintiff could return to her past job with an RFC as offered by the ALJ. The ALJ did not give the VE any description of the work demands of claimant's past relevant work. The VE responded that claimant could still function as a telemarketer within her limitations, and that the job was sedentary and unskilled. In his written decision, the ALJ merely stated that "Claimant's past relevant work as a telemarketer did not require the performance of work-related activities precluded by the limitations that he set forth." Tr. 310. Nothing in the record, however, indicates exactly what the ALJ found plaintiff's work as a telemark-

eter required. Although defendant points out that the VE testified that plaintiff's work as a telemarketer was sedentary and unskilled, that testimony does not identify the specific demands of her past work. Even if the job was sedentary, under the RFC as found by the ALJ, plaintiff could only perform it if, for instance, she could stand for two hours of the day, and if the job did not require more than short periods of gripping and grasping. It is possible that her past job as a telemarketer required plaintiff to grasp a pencil for long periods of time, or that it precluded her from being able to stand for two hours out of an eight hour day.[5] It appears that the ALJ delegated his fact-finding responsibilities at step four, a practice that the Tenth Circuit discourages. *Winfrey*, 92 F.3d at 1025. (ALJ may rely on information supplied by VE at step four, but ALJ must make required findings on record, including claimant's ability to perform past relevant work.) "When, as here, the ALJ makes findings only about the claimant's limitations, and the remainder of the step four assessment takes place in the VE's head, we are left with nothing to review." *Id.*

Assuming that plaintiff could not perform her prior job as a telemarketer, the ALJ should have proceeded to step five to determine whether she could perform jobs in the national economy. The ALJ, however, did not make an alternative finding at step five. Plaintiff filed her application in this case October 27, 1993—some seven years ago. The Commissioner has had two chances to conduct a proper determination. In light of the Commissioner's failure to satisfy his burden of proof at step five, and the protracted delay which has resulted from his disposition of the proceedings, the Court finds that the

judgment of the Commissioner should be reversed and remanded so that the Commissioner can award benefits for the closed period of disability. *See Ragland v. Shalala*, 992 F.2d 1056, 1060 (10th Cir.1993) (remanding for award of benefits because of Commissioner's "patent failure" to meet step five burden of proof and long delay because of Commissioner's erroneous disposition).

**IT IS THEREFORE ORDERED** that the case is **REVERSED** and **REMANDED** under sentence four of 42 U.S.C. § 405(g) with instructions to the Commissioner to issue a decision that plaintiff is disabled based on her application filed October 27, 1993, for the closed period from October 27, 1993 to December 6, 1995.

---

5. The only record evidence concerning the specific demands of plaintiff's telemarketing job includes: (1) plaintiff's description on her application for social security benefits, which indicates that the job required writing to list each call, and only sitting; and (2) vocational expert testimony (at the first hearing) that "telemarketer would seem to get in under the no excessive writing a few minutes at a time." Tr. 288. In the first hearing the VE testified based on a much less restrictive RFC than that posed by the ALJ in the current proceeding.